## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

GREGORY BROWN,

     Plaintiff,

v.                              Case No.  3:20-cv-87-HLA-MCR

CAPTAIN WOODS,[1] et al.,

     Defendants.

_____

## ORDER

### I.  Status

Plaintiff, an inmate in the custody of the Florida Department of Corrections (FDOC), initiated this action by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C § 1983. Plaintiff is proceeding on an Amended Complaint (AC; Doc. 5). Plaintiff names these individuals as Defendants: Captain Woods; Lieutenant T. Tomlin; Sergeant Watson; Sergeant Williams; and Sergeant Bayron.[2] See AC at 2-4. He sues each

---

[1] The **Clerk** is directed to correct the caption of the docket to reflect "Captain Woods" and Sgt. "Williams" as the correct spelling of these Defendants' names.

[2] The Court dismissed without prejudice Defendants "Officer John Doe #1" and "Officer John Doe #2." See Doc. 27.

Defendant in their individual capacities. <u>Id.</u> Plaintiff alleges that while he was housed at Florida State Prison (FSP), Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when they used and/or ordered the use of chemical agents and excessive physical force during a cell extraction and failed to intervene in the uses of force. <u>See generally</u> AC. As relief, Plaintiff seeks declaratory relief, as well as compensatory, punitive, and nominal damages. <u>Id.</u> at 7. Defendants filed Answers to the Amended Complaint. <u>See</u> Docs. 24-25.

Before the Court is Defendants' Motion for Summary Judgment (Motion; Doc. 38) with exhibits (Mot. Exs. A-Q; Docs. 38-1 through 38-17). The Court advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and allowed him to respond to the Motion. <u>See</u> Order of Special Appointment (Doc. 8). Plaintiff, with help from retained counsel, filed an Amended Response in opposition to the Motion (Response; Doc. 50) with exhibits (Resp. Exs. 1-2; Doc. 50-1 and Doc. S-47). The Motion is ripe for review.

## II.   <u>Plaintiff's Allegations</u>

Plaintiff's claims against Defendants arise from a June 22, 2019, incident at FSP, during which chemical agents and physical force were used on Plaintiff. According to Plaintiff, at the time of the uses of force, Plaintiff was housed in a single-person cell containing a toilet that only the guards could flush. Resp. Ex. 1 at 1. Because the toilet was full of feces and urine, Plaintiff requested help from the guards by placing a piece of paper in his cell window that read "FLUSH," but officers refused to assist Plaintiff all day, resulting in his cell "stifling with the smell of human waste." <u>Id.</u>

According to Plaintiff, Defendant Tomlin approached Plaintiff's cell and advised Plaintiff that the "higherups" decided Plaintiff "should have a rough cell extraction run on him and there was no way out." Response at 2. Tomlin allegedly stated, "I'[ll] tell the cell extraction members to beat you to sleep if you make me do paperwork and gas you." AC at 9; Response Ex. at 1. Tomlin then advised Plaintiff "he would go easier on [Plaintiff] if [Plaintiff] would make some noise for the camera." Response Ex. 1 at 1. Plaintiff asserts that Tomlin walked away, but returned to Plaintiff's cell around 9:30 p.m., so Plaintiff "started tapping on the

window for the camera." Id. According to Plaintiff, Tomlin then stated to the camera that Plaintiff was causing a disturbance and asked Plaintiff to stop tapping on the window. Id. Plaintiff "admit[s] [he] did not stop tapping when told to do so because that is what we had agreed to." Id.

Plaintiff alleges that Tomlin then ordered Plaintiff to submit to hand restraints, so he could be placed on seventy-two-hour property restriction. AC at 9. Plaintiff admits he refused to submit to the restraints, so Defendant Woods, upon Tomlin's order, administered three one-second bursts of chemical agents into Plaintiff's cell. Id. According to Plaintiff, this first use of chemical agents "was justified due to [Plaintiff] being disorderly or disobeying an order . . . ." Id. Plaintiff alleges that Tomlin and Woods then walked away, but soon came back to Plaintiff's cell on two more occasions and administered, without notice, two more rounds of chemical agents when Plaintiff "was not yelling, banging, kicking, disobeying an order or otherwise creating a disturbance." Id. at 10.

According to Plaintiff, after the third use of chemical agents, Tomlin summoned the Cell Extraction Team, comprised of Defendants Watson, Williams, Bayron, and two John Does. Id. at 10. Plaintiff asserts that

Nurse Marshall asked Plaintiff if he could "cuff up" for a decontamination shower, to which Plaintiff alleges he "replied (yes)." Id. According to Plaintiff, Tomlin, with the Cell Extraction Team in tow, ordered Plaintiff to submit to hand restraints and Plaintiff agreed to do so. Id. at 10. But Plaintiff contends that Tomlin ordered Plaintiff's cell door opened, and once the door was opened Plaintiff "managed to come out of the cell into the hallway area." Id. at 10-11.

Plaintiff asserts that the Cell Extraction Team members "immediately slammed [Plaintiff] on the ground and command[ed] [him to] 'stop resisting' even though [Plaintiff] was not resisting at all." Id. at 11. He maintains the extraction members "started punching [him] in the face[,] head[,] and other parts of his body while [] Tomlin and [] Woods stood by watching and did not intervene when they had an opportunity to do so." Id. Plaintiff alleges that during the beating, "one of the cell extraction members inserted two fingers into [Plaintiff's] rectum which made [Plaintiff] scream out in pain . . . ." Id. at 11. He contends that one of the team members placed leg shackles on him and dragged him back into his cell where they punched him in the face, ribs, stomach, back, and

other parts of his body. Id. at 11-12. Plaintiff asserts that one of the team members slammed Plaintiff's forehead into the concrete floor. Id. at 12.

Plaintiff contends that he was eventually knocked unconscious. Id. at 12. When Plaintiff regained consciousness, he was covered in blood and transported to medical where he could shower and change his clothing. Id. at 12-13. Nurse Marshall conducted a post use of force physical, documenting lacerations below Plaintiff's left eyebrow, upper lip, and left side, as well as abrasions on his right and left cheek. On July 2, 2019, Defendant Watson advised Plaintiff that Tomlin told the Cell Extraction Team to physically beat Plaintiff "and that's why [he] got beat like [he] did." Id. According to Plaintiff, he continues to suffer severe emotional distress, panic attacks, and terrifying "flashbacks" and nightmares. AC at 13.

Based on these allegations, Plaintiff raises these claims: (1) Defendants Tomlin and Woods violated his Eighth Amendment rights by ordering and administering, respectively, the second and third administrations of chemical agents; (2) Defendants Watson, Williams, and Bayron violated Plaintiff's Eighth Amendment rights by using excessive force during the cell extraction; and (3) Defendants Tomlin and

Woods failed to intervene and stop the unnecessary use of physical force during the cell extraction.

## III.   <u>Parties' Positions</u>

### a. Defendants' Position

Defendants argue that Tomlin was allowed to direct Woods to administer chemical agents and then order Watson, Bayron, and Williams to use the minimum amount of force necessary to restrain Plaintiff. Motion at 9. They also contend Woods, Watson, Bayron, and Williams are not liable for excessive use of force because the force used was reasonable and necessary under the circumstances. <u>Id.</u> They contend that the use of force was required by Plaintiff's continued disruptive behavior and refusal to obey orders. And that once Plaintiff was restrained, all use of force ceased. <u>Id.</u> They suggest that the incident was no more than a <u>de minimis</u> use of force and that the force was applied in a good-faith effort to maintain and restore discipline. <u>Id.</u> Next, they assert that Tomlin and Woods are not liable for any alleged failure to intervene as the force used was "totally reactionary to Plaintiff's unjustified force by himself, and failure to obey lawful commands . . . ." <u>Id.</u> at 13.

In support of their position, Defendants submitted exhibits, including the Declaration of Teddy Tomlin (Mot. Ex. A); the Declaration of Brandon Woods (Mot. Ex. B); the Declaration of Tyler Watson (Mot. Ex. C); the Declaration of Alberto Bayron (Mot. Ex. D); the Declaration of Allan Williams (Mot. Ex. E); Reports of Force Used (Mot. Exs. F-H); Use of Force Incident Reports (Mot. Exs. I-P); and Post-Use-of-Force Exam (Mot. Ex. Q).

### b. Plaintiff's Position

Plaintiff asserts that Defendants are not entitled to summary judgment because "Plaintiff's version of events and that of Defendants differ radically." Response at 10. Plaintiff denies making any sort of disturbance after Defendants' first application of chemical agents, and thus the second and third use of chemical agents were excessive. Id. at 3. Further, when the extraction team opened his cell door, Plaintiff contends leg irons were applied almost immediately and he never locked his arms underneath his body. Id. Plaintiff argues that the video evidence fails to provide an unobstructed view of the events and thus does not contradict his version. Id. And taking his version as true, the force cannot be dismissed as de minimis were he suffered broken teeth, permanent

8

vision damage, and severe face and body lacerations. Id. Finally, Plaintiff argues that Defendants' argument that Tomlin and Woods are not liable for failing to intervene impermissibly asks the Court to weigh the evidence. Id. at 12. In support of his position, Plaintiff provides his Declaration (Resp. Ex. 1) and, with the Court's permission, submitted under seal a digital video recording of the incident (Resp. Ex. 2; Doc. S-47).

## III.  Summary Judgment Standard

"'Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Hinkle v. Midland Credit Mgmt., Inc., 827 F.3d 1295, 1300 (11th Cir. 2016) (quoting Jurich v. Compass Marine, Inc., 764 F.3d 1302, 1304 (11th Cir. 2014)); see Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Bowen v. Manheim Remarketing, Inc., 882 F.3d 1358, 1362 (11th Cir. 2018) (quotations and citation omitted); see Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1311 (11th Cir. 2018) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine

issue for trial." (quotations and citation omitted)). In considering a summary judgment motion, the Court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." Hornsby-Culpepper, 906 F.3d at 1311 (quotations and citation omitted).

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote and citation omitted); see Winborn v. Supreme Beverage Co. Inc., 572 F. App'x 672, 674 (11th Cir. 2014) (per curiam) ("If the movant satisfies the burden of production showing that there is no genuine issue of fact, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'" (quoting Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008)). "A 'mere scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Loren v. Sasser, 309 F.3d 1296, 1302 (11th Cir. 2002) (quoting Walker v.

Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (internal quotations omitted)).

## IV.   Eighth Amendment

"The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. In considering an Eighth Amendment excessive force claim, [the Court] must consider both a subjective and objective component: (1) whether the 'officials act[ed] with a sufficiently culpable state of mind,' and (2) 'if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation.'" Tate v. Rockford, 497 F. App'x. 921, 923 (11th Cir. 2012) (per curiam) (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)).

> In both Fourteenth and Eighth Amendment excessive force claims, whether the use of force violates an inmate's constitutional rights "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Whitley v. Albers, 475 U.S. 312, 320-21 (1986) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (establishing the standard for an Eighth Amendment excessive force claim); see Bozeman v. Orum, 422 F.3d 1265, 1271 (11th Cir. 2005) (applying the Whitley test in a Fourteenth Amendment excessive force case). If force is used "maliciously and sadistically for the very purpose of causing harm," then it necessarily shocks the conscience. See Brown v. Smith, 813

> F.2d 1187, 1188 (11th Cir. 1987) (stating that the
> Eighth and Fourteenth Amendments give
> equivalent protections against excessive force). If
> not, then it does not.

Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (per curiam).

"Although the extent of the injury is a relevant factor in determining the

amount of force applied, it is not solely determinative of an Eighth

Amendment claim." Muhammad v. Sapp, 494 F. App'x. 953, 957 (11th

Cir. 2012) (per curiam) (citing Wilkins v. Gaddy, 559 U.S. 34, 37 (2010)).

> When prison officials maliciously and sadistically
> use force to cause harm, contemporary standards
> of decency always are violated. See Whitley, supra,
> 475 U.S., at 327. This is true whether or not
> significant injury is evident. Otherwise, the
> Eighth Amendment would permit any physical
> punishment, no matter how diabolic or inhuman,
> inflicting less than some arbitrary quantity of
> injury. Such a result would have been as
> unacceptable to the drafters of the Eighth
> Amendment as it is today.

Hudson, 503 U.S. at 9.

The standard in an excessive use of force case is as follows:

> [O]ur core inquiry is "whether force was applied in
> a good-faith effort to maintain or restore
> discipline, or maliciously and sadistically to cause
> harm." Hudson v. McMillian, 503 U.S. 1, 112 In
> determining whether force was applied
> maliciously and sadistically, we look to five
> factors: "(1) the extent of injury; (2) the need for

12

application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates[, as reasonably perceived by the responsible officials on the basis of facts known to them]. . . ." Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quotations omitted). However, "[t]he Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 112 S.Ct. at 1000 (quotations omitted).

McKinney v. Sheriff, 520 F. App'x 903, 905 (11th Cir. 2013) (per curiam).

The Eleventh Circuit has also noted "that where chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement." Thomas v. Bryant, 614 F.3d 1288, 1311 (11th Cir.2010) (citations omitted). Further, "an officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 924 (11th Cir. 2000); Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998). This liability, however, only arises when the officer is able to intervene and fails to do so. See Keating v. City of Miami, 598 F.3d 753, 764 (11th Cir. 2010); see

also <u>Fils v. City of Aventura</u>, 647 F.3d 1272, 1290 n.21 (11th Cir. 2011);

<u>Brown v. City of Huntsville</u>, 608 F.3d 724, 740 n.25 (11th Cir. 2010)

("Because the relevant events happened so quickly, the record does not

reflect any point at which [the officer] could have intervened to prevent

[another officer's] use of excessive force . . . .").

## V.   <u>Analysis</u>

### a. Chemical Agents

Plaintiff claims that Tomlin and Woods violated his Eighth

Amendment rights by spraying Plaintiff with chemical agents without

penological justification. AC at 16.

In his Declaration, Tomlin provided a chronology of the events with

details related to the application of chemical agents. He stated, in

relevant part:

> Organized chemical and physical force was utilized on inmate Brown, in order to quell his disturbance and to overcome his physical resistance to lawful commands.
>
> Sergeant Sean Johnson initially counseled with Brown, due to him kicking on the door of his assigned cell.
>
> Brown refused to comply with Sergeant Johnson's orders

14

I arrived cell-front, and ordered Brown to cease his disruptive behavior, to which he refused to comply.

I reviewed Brown's DC4-650b and contacted RN Shannon Marshall, both of which indicated that he did not have any medical conditions that would be exacerbated by the use of chemical agents.

Hand-held video-recording was initiated by Camera Operator #1, Officer William Crouch, and crisis intervention techniques were conducted by RN Harold, which were deemed unsuccessful.

I contacted the Duty Warden, Ms. Stanford, who authorized the use of OC chemical agents, to bring Brown into compliance with lawful orders.

I issued Brown a final order to cease his disruptive behavior, and advised him that failure to comply with that order would result in the use of chemical agents.

I also advised him, if chemical agents were utilized, he would be required to submit to restraint procedures in order to receive a cool-water decontamination shower, and that failure to comply would result in additional applications of chemical agents.

At the conclusion of the three (3) minute time-frame, Brown continued his disruptive behavior by yelling out of the rear window of his assigned cell and wrapped himself in his state-issued mattress, linens, and clothing.

15

Captain Woods utilized two (2) applications of OC chemical agents, which was unsuccessful in gaining his compliance with lawful orders.

I contacted the Duty Warden, Ms. Stanford, who authorized the use of CS chemical agents, if necessary, to bring Brown into compliance with lawful orders.

Captain Woods utilized one (1) application of CS chemical agents, which was unsuccessful in gaining Brown's compliance with lawful orders.

I contacted the Duty Warden, Ms. Stanford, who authorized the use of Forced Cell Extraction Team, if necessary, to bring Brown into compliance with lawful orders.

. . . .

Mot. Ex. A (paragraph enumeration omitted). Tomlin then describes the use of physical force and the later ordering of a four-man carry of Plaintiff to the decontamination shower. Id. Plaintiff then underwent a use-of-force medical assessment. Id. Tomlin continued that:

I instructed Brown to remain in an upright seated or standing position for a period of sixty (60) minutes following the application of chemical agents, not to use any soaps, lotions or ointments for seventy-two (72) hours, and not to rub the affected area with a cloth.

. . . .

16

> The use of force incident appears to be in compliance with use of force policy, Florida Administrative Code 33-602.210.
>
> Brown received three (3) Disciplinary Reports as a result of this incident: One (1) for 9-17 (Disorderly Conduct), written by Sergeant Johnson; one (1) for 6-1 (Disobeying a Verbal Order); written by me; and one (1) for 7-4 (Misuse of State Property), written by me.

Mot. Ex. A at 5 (paragraph enumeration omitted). Tomlin's Use of Force Incident Report reiterates the statements in Tomlin's Declaration. Mot. Ex. I.

In his Declaration, Woods described the use of chemical agents as follows:

> At approximately 9:45PM, on June 22, 2019, while assigned as the D-Shift Supervisor, I was present on B-Wing due to an organized chemical use of force on Inmate Brown, Gregory [].
>
> Prior to force being utilized, Lieutenant Teddy Tomlin advised me that Brown had been creating a disturbance on the wing by kicking on the cell door, and that the Duty Warden, Classification Supervisor, Krissy Stanford had authorized the use of OC chemical agents.
>
> At this time, I administered three (3) one (1) second bursts of OC chemical agents into cell B1324S, through the handcuffing port, striking the state-issued mattress, linens and clothing that

17

Brown was utilizing to block the application of chemical agents.

After the allotted time, Brown continued to refuse all orders.

At approximately 9:52PM, I administered three (3) one (1) second bursts of OC chemical agents into cell B1324S, through the handcuffing port, striking the state-issued mattress, linens and clothing that Brown was utilizing to block the application of chemical agents.

After the allotted time, Brown continued to refuse all orders.

At approximately 10:00PM, I administered three one (1) second bursts of CS chemical agents into cell B1324S, through the handcuffing port, striking the state issued mattress, linens and clothing that Brown was utilizing to block the application of chemical agents.

No further force was utilized by this writer.

I received a post use of force medical assessment, with no injuries noted.

I am certified in the use of chemical agents as reflected on my [] (Firearms Qualifications Card), which is valid through 04/2020.

. . . .

Mot. Ex. B (paragraph enumeration omitted). Woods's Report of Force
Used (Mot. Exs. F, H) and Use of Force Incident Report (Mot. Ex. I)
reiterate the statements made in Woods's Declaration.

In his Declaration, Plaintiff states the following about the use of
chemical agents:

> On that day, I was locked in a cell with a
> toilet that was full of feces and urine and could
> only be flushed by the guards outside the cell. I had
> placed a piece of paper in the window that said,
> "FLUSH" but as of 9:30 p.m. on June 22, 2019,
> none of the officers would flush the toilet for me all
> day. The cell was stifling with the smell of human
> waste.

> That night, Lieut. Teddy Tomlin came to my
> cell without the camera and told me that the
> "higher ups" were upset with me and had ordered
> that I should be given a rough cell extraction and
> he said there was no way out. Lieut. Tomlin told
> me "I'll tell the cell extraction members to beat you
> to sleep if you make me do paperwork and gas
> you." He told me he would go easier on me if I
> would make some noise for the camera.

> At about 9:30 p.m. Lieut. Tomlin approached
> my cell and I started tapping on the window for the
> camera. Lieut. Tomlin stated on video that I was
> causing a disturbance and at the time, I was
> repeatedly tapping on the window with a brush. I
> admit I did not stop tapping when told to do so
> because that is what we had agreed to.

After a few minutes, I stopped the tapping. Lieut. Tomlin said something about using chemical agents and I begin to cover myself with bedding since I believed that Tomlin was going to use chemical agents as he said he would do. I knew there was nothing I could do to stop it from happening so I tried to make it as easy as I could.

Lieut. Tomlin came back and said to the camera that I was using my bedding to protect myself from the effects of chemical agents. Then, without further warning, Capt. Brandon Woods sprayed me with chemical agents through the opening in the handcuff port.

A little later, Lieut. Tomlin returned with Capt. Woods and noted that I was using my bedding as a shield against the chemical spray. Without further notice, Capt. Woods began spraying three blasts of chemical agents. I tried to avoid the gas on my skin and in my mouth and nose as much as I could with my bedding.

A little later, they returned and Capt. Woods sprayed three more blasts of chemicals. I wanted to agree [to] cuff up to try to avoid the cell extraction although Lieut. Tomlin had told me I would have the team run on me. I thought he would live up to his promise to go easier. Lieut. Tomlin returned with the Cell Extraction Team. He had Nurse Marshall ask me if I would cuff up and I said I would but I couldn't speak very loud because I was still choking on gas. I said I would and I think Nurse Marshal heard me but she turned and said, "That's a 'no.'" Tomlin asked me, "Are you gonna come out?" and without waiting for a response, Tomlin ordered the team into my cell.

. . . .

Resp. Ex. 1 (paragraph enumeration omitted).

The video evidence begins at 9:35 p.m. on June 22, 2019, with Tomlin stating on video that Plaintiff is causing a disturbance by kicking and banging on his cell door and back window. Resp. Ex. 2. Tomlin explains that he and a nurse will try to persuade Plaintiff to cease his disturbance. <u>Id.</u> Tomlin and the nurse walk toward Plaintiff's cell and Plaintiff can be heard and seen banging violently on his cell door. <u>Id.</u> It appears he has a white piece of paper stuck to his cell door, though the video does not show if anything is written on the paper. <u>Id.</u> The nurse asks Plaintiff to stop his disturbance, but Plaintiff does not cease. <u>Id.</u> Tomlin then gives Plaintiff one final order to cease, but Plaintiff continues banging on his door. <u>Id.</u>

Plaintiff then begins wrapping clothing around his mouth and face. <u>Id.</u> Tomlin leaves and reappears with Woods. <u>Id.</u> Tomlin addresses the video, stating Plaintiff is wrapping himself in his state-issued clothing and bedding to protect himself. <u>Id.</u> Woods then approaches Plaintiff's open handcuffing port and administers chemical agents into Plaintiff's cell at 9:45 p.m. <u>Id.</u> Tomlin and Woods walk out of the camera's view. <u>Id.</u>

21

Plaintiff can be seen through the cell window, fanning and wiping his face near the rear of his cell. Id. Tomlin and Woods return, and Tomlin asks Plaintiff if he would like to take a decontamination shower, and no response is heard from Plaintiff. Id. Tomlin asks the camera man to approach the cell window and Plaintiff can been seen lying on the floor of his cell wrapped in his state-issued linens and bedding. Id. Woods then administers through the handcuffing port three more bursts of chemical agents at 9:52 p.m. Id. Tomlin and Woods walk outside the camera's view. Id. The video does not show Plaintiff through the cell window following the second use of chemical agents. Id.

Tomlin and Woods return, and Tomlin asks Plaintiff if he wants to take a decontamination shower. Id. No audible response from Plaintiff is heard. Id. Tomlin then opens the handcuffing port and Woods administers a third application of three bursts of chemical agents at 10:00 p.m. Id. Woods and Tomlin then walk away. Id. Plaintiff is seen through the cell window standing up, wiping his face with his linens, and fanning the air near the rear of his cell. Id. A few minutes later, Plaintiff appears to be dancing or pumping his fists in the air, but no banging

22

sounds are heard. Id. Tomlin returns with a five-man Cell Extraction Team.

In this case, Plaintiff does not challenge Tomlin's and Woods's administration of the first round of chemical agents. Instead, he alleges that they had no penological justification for administering the second and third rounds "without notice." Resp. Ex 1. Tomlin states that all three applications of chemical agents were "unsuccessful in gaining [Plaintiff's] compliance with lawful orders." Mot. Ex. A. Woods also states that after each application, "[Plaintiff] continued to refuse all orders." Mot. Ex. B.

However, while the video footage provides a detailed chronology, it does not capture Plaintiff refusing to comply with Tomlin's or Woods's orders following the first application of chemical agents. Indeed, before the first use of chemical agents, Plaintiff is seen and heard violently banging on his door, but no such banging or noises are seen or heard after the first chemical spray. Further, although Tomlin can be heard asking Plaintiff to submit to a decontamination shower following each use of chemical agents, the video does not capture an audible response from Plaintiff refusing Tomlin's orders or otherwise indicating Plaintiff

acknowledged or heard Tomlin's questions (possibly because Plaintiff's body and face were wrapped in layers of state-issued linens and clothing). Given the differences in the parties' sworn recollections, there remain genuine issues of material fact as to whether Tomlin and Woods appropriately used chemical agents or maliciously targeted Plaintiff with excessive force. Defendants' Motion as to Plaintiff's Eighth Amendment claim relating to Tomlin's and Woods's application of chemical agents is due to be denied.

### b. Use of Physical Force and Failure to Intervene

Plaintiff alleges that Defendants Watson, Williams, and Bayron violated his Eighth Amendment rights by using excessive force during their cell extraction. AC at 16-17. He also claims that Defendants Tomlin and Woods failed to intervene during the use of excessive force. Id. at 16.

In his Declaration, Tomlin described the use of physical force that occurred following the third application of chemical agents. Mot. Ex. A. He stated:

> I summoned the Forced Cell Extraction Team, who introduced themselves on the hand-held video camera.
>
> RN Marshall then explained to Brown the benefits of receiving a cool-water decontamination

shower, and advised him that failure to comply with that order would result in the use of the Forced Cell Extraction Team.

Inmate Brown continued to refuse all orders.

I ordered for the cell door to be opened, and the Forced Cell Extraction Team utilized the least amount of force necessary to control and restrain Inmate Brown.

Once Brown was restrained, I ordered him to stand up and walk to the shower area, to which he refused.

I instructed team members to conduct a proper four-man carry technique, to carry him to the second-floor shower.

Upon arriving at the second-floor shower, Brown became compliant with all orders. All force ceased at this time.

Brown received a cool-water decontamination shower and clean boxers, and was then escorted to the Florida State Prison Medical Clinic, where he received a post use of force medical assessment by RN Marshall, with the following injuries noted: A laceration below his left eyebrow, a laceration to the left side of his upper lip, abrasions to his left and right cheek and a swollen bottom lip.

. . . .

Following the assessment, Brown was escorted back to B-Wing and placed in the third-

floor shower, awaiting the decontamination of his assigned cell.

Once his assigned cell was decontaminated, Inmate Brown was resecured in cell B1324S, without further incident.

I conducted a closing statement on hand-held camera and all videorecording ceased.

Inmate Brown made the following allegation during this incident; He stated, "Your finger is in my ass[.]"

This allegation is refuted by hand-held video and is not PREA reportable.

Cell B1324S was decontaminated by B-Wing orderlies under the direct supervision of B-Wing staff.

Brown was monitored for the required sixty (60) minute time frame by Officer Crouch, with no signs of respiratory distress noted.

The use of force incident appears to be in compliance with use of force policy, Florida Administrative Code 33-602.210.

Brown received three (3) Disciplinary Reports as a result of this incident: One (1) for 9-17 (Disorderly Conduct), written by Sergeant Johnson; one (1) for 6-1 (Disobeying a Verbal Order); written by me; and one (1) for 7-4 (Misuse of State Property), written by me.

Mot. Ex. A (paragraph enumeration omitted). Woods discussed

witnessing the use of physical force in his Declaration. Mot. Ex. B. Woods

stated:

> At approximately 10:14PM, I witnessed the
> Forced Cell Extraction Team, consisting of
> Sergeant Tyler Watson, Sergeant Alberto Bayron,
> Sergeant Allen Williams, Sergeant Benjamin
> Golemnbiewski and Sergeant Gregory Garrett,
> utilize physical force to control and restrain
> Brown.
>
> At approximately 10:18 PM, I witnessed Sgt.
> Watson, Sergeant Bayron, Sergeant Williams, and
> Sergeant Garrett utilize physical force to conduct
> a four-man carry technique, to carry Brown from
> his assigned cell to the second-floor shower area.
>
> No further force was witnessed by this
> writer.

Mot. Ex. B (paragraph enumeration omitted).

Defendants Watson, Bayron, and Williams also submitted

Declarations. Mot. Exs. C-E. Each Declaration begins describing the

incident as follows:

> On June 22, 2019, while assigned as the
> Forced Cell Extraction Team member [ ], I was
> present on B-Wing, due to an organized physical
> use of force on Inmate Brown, Gregory DC#
> J39575.

I introduced myself on hand-held video and Lieutenant Teddy Tomlin instructed the team members to utilize the least amount of force necessary to control and restrain Inmate Brown, should we enter the cell.

Lieutenant Tomlin issued Brown a final order to submit to restraint procedures, in order to receive a cool-water decontamination shower, and advised him that failure to comply would result in the use of the Forced Cell Extraction Team.

Brown continued to refuse all orders.

At approximately 10:14PM, Lieutenant Tomlin attempted to open the door to cell B1324S, but Brown utilized his body leverage to prevent the door from opening fully.

Mot. Exs. C at 1-2, D at 1-2, E at 1-2 (paragraph enumeration omitted).

Watson described his participation as follows:

As Lieutenant Tomlin and Sergeant Alberto Bayron were able to pull the cell door open, Brown attempted to dive through the opening in the cell door.

I utilized the protective shield to strike Brown in his facial area, and then forced him to the floor, in a prone position.

The protective shield then became wedged in the cell door threshold, preventing me from being able to cover Brown and protect other team members from possible striking blows.

28

I relinquished the protective shield and utilized my full body weight to lay on Brown's back, preventing him from possibly striking other team members.

Other team members were able to acquire a grasp of Brown's legs, and pull him further into the cell, so that team members could reposition themselves around him.

As other team members were able to enter the cell, I repositioned myself on Brown's right side, grasped his right bicep with both of my hands, and attempted to pull his right arm from under his body.

Brown locked his arms underneath his chest, and refused to relinquish them.

Due to Brown being positioned at the doorway of the cell, I was unable to maintain my position on the right side of him.

I repositioned my body near Brown's head, grasped his upper back, and utilized my body weight to pin his upper body to the floor.

Once other team members were able to restrain Brown, I relinquished my grasp of Brown and stood up.

All force temporarily ceased at this time.

Lieutenant Tomlin ordered Brown to stand up and walk to the shower area, to which he refused.

Lieutenant Tomlin then instructed team members to conduct a proper four-man carry technique, to carry Brown to the second-floor shower area.

I grasped his left bicep with both my hands, and assisted other team members in conducting a four-man carry technique, to carry Brown to the second-floor shower.

Upon arriving at the shower area, I allowed him to stand up and relinquished my grasp of him.

No further force was utilized or witnessed by this writer.

I received a post use of force medical assessment, with no injuries noted.

Mot. Ex. C (paragraph enumeration omitted). Watson's Use of Force Incident Report reiterates those statements. Mot. Ex. J.

In his Declaration, Bayron explained his participation as follows:

As Lieutenant Tomlin and I were able to pull the cell door open, Brown attempted to dive through the opening in the cell door.

I witnessed Sgt. Tyler Watson strike Brown with the protective shield, and force him to the floor, in [a] prone position.

Due to Brown's position in the doorway of the cell, I was unable to acquire a grasp of his arms.

I positioned myself [on] his left side, grasped his left bicep with both of my hands, and

30

attempted to pull his arm from underneath his body.

As other team members were able to pull Brown further into the cell, I released my grasp of his arm, disengaged, and stood up.

I attempted to enter the cell, but was unable to do so, due to multiple team members being positioned in the threshold of the cell.

Once other team members were able to restrain Brown, I exited the cell and all force temporarily ceased.

Lieutenant Tomlin ordered Brown to stand up and walk to the shower area, to which he refused.

Lt. Tomlin then instructed team members to conduct a proper four-man carry technique to carry inmate Brown to the shower area.

I grasped Brown's left leg with both of my hands, and assisted other team members in conducting a four man carry technique to carry Brown to the second floor shower.

Upon arriving at the shower area, I allowed him to stand up and relinquished my grasp of him.

No further force was utilized or witnessed by this writer.

I received a post use of force medical assessment, with no injuries noted.

Mot. Ex. D (paragraph enumeration omitted).

In his Declaration, Williams described his participation as follows:

As Lieutenant Tomlin and Sergeant Alberto Bayron were able to pull the cell door open, Brown attempted to dive through the opening in the cell door[.]

I witnessed Sergeant Tyler Watson force him to the floor, in a prone position.

Due to Brown's position in the doorway of the cell, I was unable to apply hand restraints.

I positioned myself on Brown's right side, and attempted multiple times to grasp his right arm, but was unable to do so.

As other team members were able to pull Brown further into the cell, I temporarily disengaged and stood up.

I was then able to enter the cell, grasp Brown's left arm with my left hand, and apply hand restraints to him.

Once restraints were applied, force temporarily ceased.

Lieutenant Tomlin ordered Brown to stand up and walk to the shower area, to which he refused.

Lieutenant Tomlin then instructed team members to conduct a proper four-man carry technique to carry Brown to the shower area.

I grasped his right arm with both of my hands, and assisted other team members in

> conducting a four man carry technique, to carry him to the second floor shower.
>
> Upon arriving at the shower area, I allowed Brown to stand up and relinquished my grasp of him.
>
> No further force was utilized or witnessed by this writer.
>
> I received a post use of force medical assessment with no injuries noted.

Mot. Ex. E (paragraph enumeration omitted). In his Use of Force Incident Report, Williams made the same statements when detailing the incident. See Mot. Ex. L.

The Post Use of Force Exam Record and Diagram of Injury lists these injuries: (1) 2.5 cm x 0.5 cm x 0.1 cm laceration below left eyebrow; (2) 0.75 cm x 0.5 cm x 0.5 cm to upper left side of lip; (3) abrasion to right and left cheeks; (4) swollen bottom lip; and (5) mild bleeding noted over left eye and mouth. Mot. Ex. Q.

In his Declaration opposing Defendants' Motion, Plaintiff describes the physical force as follows:

> Lieut. Tomlin returned with the Cell Extraction Team. He had Nurse Marshall ask me if I would cuff up and I said I would but I couldn't speak very loud because I was still choking on gas. I said I would and I think Nurse Marshal heard

me but she turned and said, "That's a 'no.'" Tomlin asked me, "Are you gonna come out?" and without waiting for a response, Tomlin ordered the team into my cell.

The team members piled on putting all their body weight on me. My pants were pulled down and someone stuck two fingers into my rectum and I yelled "get your fingers out my ass[.]" I had come part way out the door so the camera could see what they were doing to me. The team dragged me back in and had the shackles on my legs right away. I never locked my arms. In about 30 seconds, they had me handcuffed but the officers continued to say "give me your hands." I replied, "You got my hands." The team knew I was already cuffed but they all kept yelling "stop resisting," to which I replied, "you got my hands, I'm in restraints, I'm cuffed up, I'm already cuffed up." They kept yelling, "stop resisting," and I answered, "I'm not resisting I'm already cuffed up."

Punches were coming from all directions and striking me in the face, ribs, stomach, and back. Sgt. Watson slammed my head against the floor and my locker. Sgt. Williams and Sgt. Bayron both choked me by pulling on the sheet I had wrapped around my face and neck. Garrett had all his weight on both knees in my back and Golembiewski shouted "stop resisting" and blocked the camera. Lieut. Tomlin was at the door. Neither Lieut. Tomlin nor Capt. Woods or any of the officers tried to intervene, though they could have.

The Cell Extraction Team members continued to beat me although I was not resisting and I was screaming with pain. One of the officers

also gouged my right eye which continues to make it hard for me to see at distances.

I was carried to the shower then taken to the clinic for a post use of force physical. The escort on my left used a pain technique on my bicep though I wasn't resisting. Officers do that so if you pull away they slam you. Nurse Marshall documented lacerations below my left eyebrow, lacerations to my upper lip, left side, and abrasions to my right and left cheek. Nurse Marshall didn't document the broken teeth or the fact that my teeth went through my lip or the bleeding from my rectum, though I pointed those things out to her.

My dermabonded cuts kept splitting open. A few days later, a second physical was done by Nurse Burgess that was more complete. I was able to see the second examination record in my medical file but I have not been able to get a copy of it.

On July 2, 2019, Sgt. Watson came to my cell and told me that Lieut. Tomlin told the Cell Extraction Team to beat me "and that's why you got beat like you did."

Resp. Ex. 1 (paragraph enumeration omitted).

The handheld video footage captures the cell extraction team line up outside Plaintiff's cell at Tomlin's direction. Resp. Ex. 2. Tomlin and Nurse Marshall address Plaintiff and Nurse Marshall advises Plaintiff about the benefits of a decontamination shower. Id. Nurse Marshall is heard asking Plaintiff, "Are you going to cuff up and come out?" Id. No

audible response from Plaintiff is heard, but Nurse Marshall turns to Tomlin and says, "That's a no." Id. Tomlin asks Plaintiff a final time if he wants to come out for a decontamination shower and again no audible response is heard. Tomlin then attempts to open the cell door and Plaintiff is seen trying to hold the cell door shut using his body weight. The cell extraction team eventually opens the door and an obvious physical struggle ensues.

However, once Plaintiff's cell door is open and the altercation begins, the Court is neither able to see each Defendant's specific actions during the restraining process nor Plaintiff's compliance or lack thereof. Instead, the specific physical acts of each participant are obscured and blocked by the "dog pile" of cell extraction team members and Tomlin's and Woods's continual movements in front of the camera. Although at various times during the incident, Tomlin yells at Plaintiff to "stop resisting," Plaintiff alleges he was never resisting and the video evidence does not show otherwise.

Approximately three minutes after the physical force starts, Woods states to the camera that hand and leg restraints are on and the cell extraction team members begin walking out of Plaintiff's cell. Tomlin

tells Plaintiff to stand up and then turns to ask the cell extraction team to assist. It is then that Plaintiff is seen on the video footage for the first time since Tomlin opened the cell door for the extraction team. Plaintiff's body appears limp, and as the team members pick Plaintiff up, the camera pans to Plaintiff's face showing it is covered in blood. Plaintiff is carried to a decontamination shower and then receives a medical evaluation.

Again, while the video evidence provides a chronology of how the events generally unfolded, it fails to capture Defendants' extraction efforts and their specific interactions with Plaintiff during the use of physical force. Given the difference in Plaintiff's sworn recollection and Defendants' Declarations, there remain genuine issues of material fact as to how Plaintiff disregarded orders; whether Watson, Bayron, and Williams appropriately used force to restrain Plaintiff and extract him from the cell; whether the force used was excessive, causing Plaintiff injuries; and whether Tomlin and Woods failed to intervene in that excessive force. As such, Defendants' Motion as to Plaintiff's Eighth Amendment claims related to the use of physical force during the cell

extraction and failure to intervene against Defendants Watson, Williams, Bayron, Tomlin, and Woods is due to be denied.

Accordingly, it is

**ORDERED**:

1.    Defendants' Motion for Summary Judgment (Doc. 38) is **DENIED**.

2.    **Within thirty days of the date of this Order**, the parties shall confer in good faith in attempt to resolve the remaining claims. If the parties reach a settlement, they shall promptly notify the Court. If the parties cannot settle the claims privately, the parties shall file a joint notice advising whether the parties believe a settlement conference with the United States Magistrate Judge will be beneficial.

**DONE AND ORDERED** at Jacksonville, Florida, this 16th day of February, 2022.

HENRY LEE ADAMS, JR.
United States District Judge

Jax-7
C:    Gregory Brown, # J39575
       counsel of record